**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald L. Ring,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>　　　　Defendant. | No. CV 10-08217-PCT-NVW<br><br>**ORDER** |

Ronald L. Ring seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied him disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and is based on legal error, the Commissioner's decision will be vacated and the matter remanded for further administrative proceedings.

**I.    Background**

　　**A.    Factual Background**

Ring was born in November 1955. He has a GED and two years of training in diesel truck technology. He worked as a mechanic for twenty years, but has not worked since December 7, 2007.

1    Ring may have contracted hepatitis C from a tainted blood transfusion in 1983, and
2 he was diagnosed in 1999.  In March 2007, when Ring's hepatitis C symptoms of fatigue
3 and pain became severe, he began a course of interferon treatment, which caused
4 headaches, nausea, vomiting, and depression.  Those side effects of the treatment were
5 generally managed by medication.  In November 2008, he completed the interferon
6 treatment, which was initially effective, but a few months later, his viral load increased.
7 He was not prescribed further treatment for the hepatitis C because of the low likelihood
8 of its success.
9    Ring also has been diagnosed with liver cirrhosis, osteoarthritis in his right knee,
10 and depression.  Ring is morbidly obese.

11 **B.   Procedural History**

12    On December 7, 2007, Ring protectively applied for disability insurance benefits
13 and supplemental security income.  He alleged disability since December 7, 2007, due to
14 hepatitis C, level 4 cirrhosis of the liver, and right knee problems.  On December 9, 2009,
15 after state agency level denials, Ring appeared and testified at an administrative hearing at
16 which he was represented by counsel.  Victoria Rei, an impartial vocational expert, also
17 appeared and testified at the hearing.

18    On February 10, 2010, the ALJ issued a decision that Ring was not disabled within
19 the meaning of the Social Security Act.  On September 11, 2010, the Appeals Council
20 denied Ring's request for review of the hearing decision.  Therefore, the ALJ's decision
21 became the Commissioner's final decision.  On November 12, 2010, Ring sought review
22 by this Court.

23 **II.   Standard of Review**

24    The district court reviews only those issues raised by the party challenging the
25 ALJ's decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  The court
26 may set aside the Commissioner's disability determination only if the determination is not
27 supported by substantial evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625,
28 630 (9th Cir. 2007).  Substantial evidence is more than a scintilla, less than a

1 preponderance, and relevant evidence that a reasonable person might accept as adequate
2 to support a conclusion considering the record as a whole. *Id.* In determining whether
3 substantial evidence supports a decision, the court must consider the record as a whole
4 and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.*
5 As a general rule, "[w]here the evidence is susceptible to more than one rational
6 interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be
7 upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

8 If the ALJ's decision is not supported by substantial evidence or suffers from legal
9 error, the court has discretion to reverse and remand either for an award of benefits or for
10 further administrative proceedings. *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir.
11 1996); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). "Remand for further
12 proceedings is appropriate if enhancement of the record would be useful." *Benecke v.
13 Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). "Conversely, where the record has been
14 developed fully and further administrative proceedings would serve no useful purpose,
15 the district court should remand for an immediate award of benefits." *Id.* (citing *Smolen*,
16 80 F.3d at 1292).

17 The ALJ is responsible for resolving conflicts in medical testimony, determining
18 credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.
19 1995). In reviewing the ALJ's reasoning, the court is "not deprived of [its] faculties for
20 drawing specific and legitimate inferences from the ALJ's opinion." *Magallanes v.
21 Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

22 **III.   Five-Step Sequential Evaluation Process**

23 To determine whether a claimant is disabled for purposes of the Social Security
24 Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). If the ALJ determines
25 that the claimant is disabled or not disabled at any step, the ALJ does not continue to the
26 next step. The claimant bears the burden of proof on the first four steps, but at step five,
27 the burden shifts to the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.
28 1999).

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At the step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meet or equal an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

## IV.    Analysis

The ALJ found that Ring meets the insured status requirements of the Social Security Act through December 31, 2012, and that he has not engaged in substantial gainful activity since December 7, 2007. At step two, the ALJ found that Ring has the following severe[1] impairments: hepatitis C status post interferon treatment, liver cirrhosis, and osteoarthritis of the right knee. At step three, the ALJ found that Ring does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. At step four, the ALJ assessed Ring's residual functional capacity and determined that he is not capable of performing past relevant work. At step five, the ALJ found that Ring was 52 years old on the alleged disability onset date, has at

---

[1] "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

- 4 -

least a high school education, is able to communicate in English, and has acquired work skills from past relevant work. The ALJ concluded that, considering his age, education, work experience, and residual functional capacity, Ring has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. Ring challenges the ALJ's findings at the steps four and five.

### A. Substantial Evidence Supports the ALJ's Residual Functional Capacity Determination.

#### 1. Legal Standard

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians: (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, more weight should be given to the opinion of a treating physician than to the opinions of non-treating physicians. *Id.* A treating physician's opinion is afforded great weight because such physicians are "employed to cure and [have] a greater opportunity to observe and know the patient as an individual." *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Where a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record. *Lester,* 81 F.3d at 830. Moreover, the Commissioner must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results. *Id.* at 832-33.

Further, an examining physician's opinion generally must be given greater weight than that of a non-examining physician. *Id.* at 830. As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons, supported by substantial

- 5 -

1  evidence in the record, for rejecting an examining physician's contradicted opinion. *Id.* at
2  830-31.
3        The opinion of a non-examining physician is not itself substantial evidence that
4  justifies the rejection of the opinion of either a treating physician or an examining
5  physician. *Id.* at 831. "The opinions of non-treating or non-examining physicians may
6  also serve as substantial evidence when the opinions are consistent with independent
7  clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957. Factors that
8  an ALJ may consider when evaluating any medical opinion include "the amount of
9  relevant evidence that supports the opinion and the quality of the explanation provided;
10 the consistency of the medical opinion with the record as a whole; [and] the specialty of
11 the physician providing the opinion." *Orn*, 495 F.3d at 631.
12       Moreover, Social Security Rules expressly require a treating source's opinion on
13 an issue of a claimant's impairment be given *controlling* weight if it is well-supported by
14 medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent
15 with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). If a
16 treating source's opinion is not given controlling weight, the weight that it will be given is
17 determined by length of the treatment relationship, frequency of examination, nature and
18 extent of the treatment relationship, relevant evidence supporting the opinion, consistency
19 with the record as a whole, the source's specialization, and other factors. *Id.*
20       Finding that a treating physician's opinion is not entitled to controlling weight
21 does not mean that the opinion should be rejected:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §404.1527. . . . In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

27 *Orn*, 495 F.3d at 631-32 (quoting Social Security Ruling 96-2p). Where there is a
28 conflict between the opinion of a treating physician and an examining physician, the ALJ

- 6 -

may not reject the opinion of the treating physician without setting forth specific, legitimate reasons supported by substantial evidence in the record. *Id.* at 632.

### 2. At Step Four, the ALJ Did Not Err by Giving Little Weight to the Opinions of Dr. McCashland, Dr. Uche, and State Agency Physicians.

At step four, the ALJ found that:

> [T]he claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). Claimant is able to lift/carry 25 pounds occasionally and up to 20 pounds frequently, occasionally kneel or squat, but must avoid climbing ladders, scaffolds and ropes. He has some environmental limitations including avoiding exposure to unprotected heights and hazardous machinery. Claimant experiences pain in his neck, right leg and knee, chest, abdomen and intermittent head aches that is of a moderate nature and would have a moderate effect on his ability to perform basic work activities, however these conditions are or can be controlled by appropriate medication without any significant adverse side effects. Additionally claimant has some other miscellaneous impairments in the form of a hypertension, fatigue, obesity, hepatitis C post interferon treatments and cirrhosis. The effect of these impairments, however, has been considered along with the other limitations already discussed and would have no more than a moderate effect on his functional abilities. Claimant also has some psychiatric problems including depression and decreased memory that are of a slight nature and would have a slight effect on his ability to perform work related tasks however these conditions are or can be controlled by appropriate medication without any significant adverse side effect.

Ring contends that the ALJ committed legal error "by rejecting the opinions of two treating sources and SSA's own state agency physician when he offered [a residual functional capacity] finding that had no legitimate medical basis in the record."

The ALJ did not commit legal error by not relying on the opinions of the state agency physicians, both of whom concluded that Ring's impairments were caused by the interferon treatment and likely to be temporary. On January 15, 2008, Roderick Harley, M.D., a state agency doctor, reviewed the medical evidence and opined that Ring could stand and/or walk (with normal breaks) at least two hours in an eight-hour workday and sit about six hours in an eight-hour workday. He further opined that Ring could climb ramp/stairs, ladder, rope, or scaffolds occasionally and could occasionally balance, stoop, kneel, crouch, and crawl. He found no environmental limitations, including extreme heat and hazards. Dr. Harley noted Ring's reports of fatigue, lethargy, and headaches for two

1  or three days following the interferon treatment and said that because of these side
2  effects, he found Ring "capable of sedentary types of work duties at this time."
3        On March 5, 2008, another state agency doctor, Glen Knosp, M.D., reviewed
4  Ring's medical records and found no exertional limitations, no postural limitations, and
5  no other limitations.  He stated that Ring was being treated for hepatitis C, the treatment
6  is expected to end three months prior to the twelve-month durational period end date, and
7  it is expected that Ring's condition will be "non-severe" within twelve months.
8        The ALJ also did not commit legal error by giving little weight to the opinion of
9  Tim McCashland, M.D.  On January 7, 2009, Dr. McCashland completed a Hepatitis C
10 Residual Functional Capacity Questionnaire regarding Ring although he had treated Ring
11 from February 2007 to February 2008.  Dr. McCashland opined that Ring had chronic
12 fatigue, weakness, and depression, which would frequently interfere with his attention
13 and concentration needed to perform even simple work tasks.  He further opined that
14 Ring could stand or walk less than two hours and sit about four hours in an eight-hour
15 workday.  He was unable to estimate the number of hours per week that Ring could work,
16 but said that Ring was not capable of working an eight-hour working day, forty hours per
17 week.  He estimated that Ring was likely to be absent from work more than four days per
18 month.  In an undated letter, Dr. McCashland stated that Ring was currently undergoing
19 treatment that was causing severe headaches, nausea, vomiting, and fatigue, which Dr.
20 McCashland believed qualified Ring for "temporary disability."
21       In his hearing decision, the ALJ explained specifically why he gave Dr.
22 McCashland's opinion little weight:

> The undersigned gives Dr. McCashland's opinion little weight as it was rendered nearly a year after claimant last saw him and does not reflect claimant's functional ability at that time.  Although the medical record establishes that while under Dr. McCashland's care, claimant did experience fatigue and nausea as a result of his interferon treatment, these symptoms resolved upon his completion of treatment and there are no treatment records from Dr. McCashland that support his opinion as of January 2009.  Additionally, the medical records from the time period where claimant was actively treated by Dr. McCashland do not support the level of restriction detailed in his opinion.

- 8 -

1  In the preceding paragraph of his decision, the ALJ said, "Claimant's symptoms more or
2  less resolved at the end of his interferon treatment until February 2009 when he began to
3  experience fatigue similar to what he had felt before." To support this finding, the ALJ
4  cited to a treating physician's notes dated February 18, 2009, which stated "[Ring] wants
5  labs ordered b/c for two weeks ha[s] been feeling lethargic like he did when he was on
6  interferon treatment." Further, the record as a whole supports the ALJ's conclusion that
7  Ring did not continue to experience adverse side effects from the interferon treatment
8  after the treatment was completed.

9        The ALJ also did not commit legal error by giving little weight to the opinion of
10 Anayochukwu Uche, M.D. On March 12, 2009, Dr. Uche performed a complete medical
11 examination of Ring. His notes state:

> The patient feels well with minor complaints, has decreased energy level and is sleeping well (using sleep aide). . . . Ronald is 53yo/m with chr hep C, liver cirrhosis who completed 20mths therapy for genotype 1a 6mths ago. He had an end of treatment response but has failed to obtain a sustained virologic response as evidence[d] by a now detectable HCV viral load of 7500copies/ml. He is un[h]appy with this result. He reports no other symptoms but wonders what his options are given his liver cirrhosis diagnosis. His LFTs show normal albumin and INR and total bilirubin suggesting that his liver function is intact and should be preserved. He denies nausea, vomiting, diarrhea or BRBPR [bright red blood per rectum].

His notes also state that a neurological evaluation revealed that Ring was alert and oriented with no impairment of recent or remote memory and had normal attention span and ability to concentrate. Dr. Uche indicated that retreatment by interferon would have a less than ten percent chance of success, which could be slightly improved if Ring lost 50-100 pounds.

      On June 12, 2009, Dr. Uche performed a follow up "recheck of general exam" of Ring. His notes state that Ring "feels well with minor complaints ([complains of] fatigue), has decreased energy level and is sleeping well," he had no new complaints, and he had gained four pounds. His notes further state that Ring's success rate with currently available therapy would be less than five percent, a new therapy may be available in 12 months, and his best chance of success was weight loss.

- 9 -

On August 18, 2009, Dr. Uche performed a follow up physical examination of Ring. His notes state that Ring reported decreased energy level and poor sleep. A mental status exam indicated Ring was oriented with appropriate mood and affect, he demonstrated ability to recall recent and remote events, and his attention span and ability to concentrate were normal.

On August 18, 2009, Dr. Uche also completed a "Hepatitis C Residual Functional Capacity Questionnaire." He opined that depression caused by the failed interferon therapy continued to affect Ring's physical condition and frequently interfered with Ring's attention and concentration needed to perform even simple work tasks. Dr. Uche further opined that Ring could work approximately 20-25 hours per week with a sit/stand option. He indicated that Ring would need more than ten 20-minute breaks per day because of pain/arthralgia and fatigue and likely would be absent from work about three days per month. The ALJ expressly stated that he gave Dr. Uche's opinion little weight because "it is not supported by his clinical notes wherein he noted claimant's complaints were 'minor' and it is not consistent with the remainder of the record."

Social Security Rules do not require a treating source's opinion on an issue of a claimant's impairment be given controlling weight if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). The ALJ found severe medical impairments as diagnosed by treating physicians and supported by objective medical evidence, found limitations consistent with substantial evidence in the record, and rejected only the opinions that Ring could not work full-time.

**B.  Substantial Evidence Does Not Support Finding that Ring's Skills Acquired from Past Relevant Work Are Transferable to Other Occupations with Jobs Existing in Significant Numbers in the National Economy.**

At step five, the ALJ concluded that:

Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in

- 10 -

significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a), and 416.968(d)).

### 1. Legal Standard

At step five, after having determined that Ring's disabilities prevent him from doing his past relevant work, the ALJ was required to decide whether Ring's impairments prevent him from performing other work that exists in the national economy, considering his residual functional capacity together with the "vocational factors" of age, education, and work experience. Social Security Policy Ruling ("SSR") 00-4p (12/4/00). Work is considered as existing in the national economy when both (1) its requirements can be met by the claimant with his or her physical or mental abilities and vocational qualifications, and (2) it exists in significant numbers either in the region where the claimant lives or in several other regions of the country. 20 C.F.R. § 404.1566(a), (b).

The Commissioner will take administrative notice of reliable job information from various governmental and other publications, but relies primarily on the *Dictionary of Occupational Titles* ("DOT"), published by the Department of Labor and its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*. 20 C.F.R. § 404.1566(d); SSR 00-4p. The Commissioner also may use the services of a vocational expert or other specialist to determine whether a claimant's work skills can be used in other work and the specific occupations in which they can be used. 20 C.F.R. § 404.1566(e). "An ALJ may take administrative notice of any reliable job information, including information provided by a [vocational expert]." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005).

An ALJ may not rely on a vocational expert's testimony regarding the requirements of a particular job without first inquiring whether the testimony conflicts with the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). When a vocational expert provides evidence about the requirements of a job, the ALJ "has an affirmative responsibility to ask about any possible conflict" between the expert evidence and information provided in the DOT. SSR 00-4p. When there is an apparent conflict

- 11 -

between occupational evidence provided by a vocational expert and the DOT, the ALJ "must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." *Id.* Neither source of evidence "automatically 'trumps' when there is a conflict." *Id.* The ALJ must resolve the conflict by determining if the explanation given by the vocational expert is reasonable and provides a basis for relying on the vocational expert's testimony rather than on the DOT. *Id.*

A vocational expert may have occupational information not listed in the DOT. *Id.* "The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." *Id.*

### 2.  **Vocational Expert Victoria Rei's Testimony**

Vocational expert Victoria Rei testified in this matter at the December 9, 2009 administrative hearing. She testified that Ring previously worked as a mechanic, which is considered skilled, SVP 7,[2] and requires a medium exertion level nationally. As Ring performed it, the job required very heavy exertion.

The ALJ posed three hypotheticals to Rei. In each, the person was 54 years old, had a GED, was certified in diesel mechanics, was obese, experienced fatigue, had hypertension, had some problems from depression, experienced some decreased memory, and had occasional headaches and pain in his neck, right leg, right knee, chest, and abdomen. Further, the hypothetical person must avoid climbing ladders, ropes, and scaffolds, should only occasionally kneel or squat, and cannot work at unprotected heights or on hazardous moving machinery. Finally, the ALJ limited the amount of weight the hypothetical person would be required to lift occasionally and frequently, but a poor telephone connection made it difficult for Rei to hear the weight lifting limitation, and the transcript does not clarify what the ALJ actually said or meant. Whatever the

---

[2]"SVP" refers to the specific vocational preparation time listed by the DOT for each described occupation.

1  amounts were, Rei stated the weight lifting requirement would exclude Ring's past
2  relevant work.
3        Given the foregoing characteristics and limitations, the ALJ asked Rei to consider
4  first a hypothetical person with "slight level of pain and psychiatric problems and all
5  other factors would be of a slight nature."  Rei responded that such a person could
6  perform the jobs of assembler of small products, inspector/packager, and marker.  The
7  ALJ asked Rei to consider a second hypothetical person with the same characteristics and
8  limitations except that the pain was of a moderate nature, the pain would normally have a
9  moderate effect on ability to do basic work activities, and the condition was controlled by
10 appropriate medication without any significant adverse side effects.  Rei responded that
11 with the pain being controlled, such a person could perform the same jobs, *i.e.*, assembler
12 of small products, inspector/packager, and marker.  Then, the ALJ asked Rei to consider a
13 third hypothetical person with the same characteristics and limitations except that the pain
14 was so severe that no amount of medication would alleviate the pain or the side effects of
15 pain medication are so significantly adverse that it would markedly interfere with the
16 person's ability to maintain pace and concentration.  Rei responded that such a person
17 could not do the work of an assembler, inspector/packager, marker, or any other kind of
18 work in the whole national economy.
19       When the ALJ asked Rei whether the skills acquired from Ring's past relevant
20 work would transfer to any jobs in the national economy, Rei responded:

> Well, there are skill levels obviously that are associated with his prior work, but the transferable skills jobs that I had identified as possibilities, not knowing what the hypotheticals would be, would be eliminated with his inability to be around hazards or moving machinery or kneeling and memory decrease.  So that he's reduced to unskilled work.

24 The ALJ then asked Rei what skills Ring would have acquired from his past relevant
25 work. She responded that his past relevant work as a mechanic required the following
26 skills:  using hand tools and machines, reading and understanding blueprints and
27 drawings, measuring, cutting, working on material with precision, using arithmetic and
28 geometry to figure out materials needed and dimensions, knowing what a finished product

- 13 -

1 is supposed to look like, and accuracy. Upon further questioning by the ALJ, Rei
2 responded:

> A. Well, the only thing that — you know, the other light skilled jobs were like brake adjustor or auto brake bonder, and that would be around moving equipment. Parts and order clerk at exertion level light, SVP 5 is semiskilled.
>
> Q. What kind would that be?
>
> A. And possibly he could do that.
>
> Q. Okay, what —
>
> A. That would not be around moving machinery.
>
> Q. Okay.
>
> A. But the other ones was [*sic*] a fuel system connector and a front end mechanic and again he'd be around moving equipment. So the only one that I can identify that he can do with the other hypothetical criteria is parts and order clerk.

13 Rei repeated "parts and order clerk" and "SVP 5" several more times during her
14 testimony. She explained that she initially thought there were no skilled positions to
15 which Ring's skills would transfer with his limitations, but then she realized that a parts
16 and order clerk would not be around moving machinery. Then the ALJ asked Rei specific
17 questions about the job of parts and order clerk. She responded that nothing in the ALJ's
18 first two hypotheticals would interfere with such a person's ability to be a parts and order
19 clerk.

20 Rei testified that if a person was absent more than twice a month, "there would be
21 no jobs." She also testified that she was not able to find any jobs at the sedentary level
22 using transferable skills.

**3. The ALJ Failed to Elicit Whether the Vocational Expert's Testimony Considered Ring's Limitation to Occasional Kneeling, Whether the Vocational Expert's Opinion Conflicted with the DOT, and, If So, Whether There Was a Legitimate Explanation for the Conflict.**

26 At step five, the ALJ determined that, considering Ring's age, education, work
27 experience, and residual functional capacity, Ring had acquired work skills from past
28 relevant work that are transferable to other occupations with jobs existing in significant

- 14 -

1  numbers in the national economy. He summarized the vocational expert's testimony as
2  follows:

> 3  The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant
> 4  work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work but no
> 5  additional skills. The vocational expert responded and testified that representative occupations such an individual could perform include: parts
> 6  and order clerk with an SVP of 5 with 6,100,000 jobs available in the national economy.
>
> 7  Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with
> 8  the information contained in the Dictionary of Occupational Titles.

9  The ALJ did not ask Rei if there was a conflict between her testimony and the
10 DOT. Although the ALJ began some of his questions with "under the Dictionary of
11 Occupational Titles," as though he intended for Rei to respond only with information
12 consistent with the DOT, it is not clear from the record that she did. It cannot be
13 concluded that the ALJ's failure to question Rei regarding any conflict between her
14 testimony and the DOT is harmless error.

15 Ring contends that by "parts and order clerk" Rei meant "parts order and stock
16 clerk," DOT code 249.367-058, because it involves parts for motor vehicles or industrial
17 equipment and has an SVP of 5. Ring argues that Rei's testimony conflicts with the DOT
18 because it requires frequent kneeling and the hypotheticals posed by the ALJ permitted
19 only occasional kneeling. However, the DOT's description of this job does not mention
20 kneeling, only that it involves storing purchased parts in storeroom bins. Rei may have
21 had additional information regarding the position of "parts order and stock clerk," DOT
22 code 249.367-058, that would have permitted her to opine that it could be performed with
23 only occasional kneeling, if only the ALJ had asked.

24 The Commissioner contends that by "parts and order clerk" Rei meant "order
25 clerk," DOT code 219.367-030, because that job is light semiskilled work and requires no
26 kneeling. That position actually is titled "Shipping-Order Clerk." Further, it has an SVP
27 of 4, not 5, involves requisitioning transportation from freight carriers, and bears no
28 apparent relationship to Ring's past relevant work.

- 15 -

1        Moreover, Rei may have been confused by the ALJ's questions and disruptions in
2 their telephone connection.  During the early part of her testimony, she had difficulty
3 hearing parts of some of the questions.  Also, it appears that the ALJ initially forgot that
4 at age 54 Ring was "closely approaching advanced age." *See* 20 C.F.R. §§ 404.1563(d)
5 ("If you are closely approaching advanced age (age 50-54), we will consider that your age
6 along with a severe impairment(s) and limited work experience may seriously affect your
7 ability to adjust to other work."), 404.1568(d)(4) ("If you are of advanced age (age 55 or
8 older), and you have a severe impairment(s) that limits you to sedentary or light work, we
9 will find that you cannot make an adjustment to other work unless you have skills that
10 you can transfer to other skilled or semiskilled work . . . that you can do despite your
11 impairment(s)."). Just before Rei was disconnected, Ring's attorney began asking Rei
12 about Ring's transferable skills and related work.  When Rei was reconnected, the ALJ's
13 focus shifted away from the unskilled jobs previously discussed to skilled or semiskilled
14 jobs.  After that, the ALJ never restated all of the limitations common to his
15 hypotheticals.  Although Ring's counsel asked Rei whether anything in the judge's
16 hypothetical would interfere with a person's ability to be a parts and order clerk, she did
17 not ask Rei whether a person limited to occasional kneeling could perform the job.

18        The ALJ has a special duty to fully and fairly develop the record and assure that
19 the claimant's interests are considered, even when the claimant is represented by counsel.
20 *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).  Here, the record is not fully
21 developed regarding whether it was Rei's opinion that a person with Ring's residual
22 functional capacity, including only occasional kneeling, could perform the job of "parts
23 and order clerk," whether Rei's opinion conflicted with the DOT, and, if so, whether the
24 conflict had a legitimate explanation.

25 .....
26 .....
27 .....
28 .....

IT IS THEREFORE ORDERED that the final decision of the Commissioner of Social Security is VACATED and this case is REMANDED for further proceedings consistent with this opinion. The Clerk shall enter judgment accordingly and shall terminate this case.

DATED this 10th day of November, 2011.

*Neil V. Wake*
Neil V. Wake
United States District Judge